STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ARTURO BONANO, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 4, 1970—Decided February 2, 1971.

Before Judges LEWIS, MATTHEWS and MINTZ.

*Mr. Edward P. Hannigan,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. John P. Jehl,* Assistant Prosecutor, argued the cause for respondent (*Mr. A. Donald Bigley,* Camden County Prosecutor, attorney).

The opinion of the court was delivered by

MATTHEWS, J. A. D. Defendant appeals his conviction of second-degree murder for which he was sentenced to serve a term of 12 to 20 years in State Prison, Trenton.

Three grounds are raised on this appeal in support of defendant's claim for reversal: (1) the trial court erred in

charging the jury that voluntary manslaughter is an unintentional killing and an act done without any intent to kill; (2) the court also erred in charging that only rage or the heat of anger are the emotions appropriate to reduce the grade of homicide to manslaughter, and (3) the court erred in failing to charge the jury that defendant was under no duty to retreat from his assailant.

■ We see no merit to the first two points raised. In *State v. Brown,* 22 *N. J.* 405, 411 (1956), our Supreme Court defined manslaughter as "the unlawful killing of another without malice, either express or implied, which may be either voluntarily, upon a sudden heat, or involuntarily, but in the commission of some unlawful act." Clearly, the definition of manslaughter accepted in this State includes only those homicidal acts which are committed without intention to kill. Defendant has cited to us *State v. Barker,* 68 *N. J. L.* 19 (Sup. Ct. 1902), as authority for the contrary view. In that case, Chief Justice Gummere, writing the opinion for the former Supreme Court, interpreted an earlier form of *N. J. S. A.* 2A:90-2, which made it a high misdemeanor to commit an assault with intent to kill, as including an attempt to commit manslaughter. We do not regard the holding in *Barker* as being apposite here, and we find it inappropriate to follow the late Chief Justice's anachronistic dictum found in his reference to the so-called "unwritten law," which is used in the opinion, as the basis for changing the accepted definition of manslaughter in this jurisdiction.

■■ Defendant also argues that the trial court unduly restricted the examples of emotions which could lessen the nature of the homicide committed here to manslaughter. Defendant suggests quite correctly that fear could also have produced the result. Our reading of the trial judge's charge, however, does not satisfy us that the jury was limited to the considerations of anger or rage when considering whether this killing was a manslaughter. We do not find plain error.

Finally, it is argued that the trial judge erred in refusing to instruct the jury that defendant was under no duty to retreat from his assailant. In dealing with this argument, it is necessary to refer to the facts as they were adduced before the jury. In doing so we accept the version most favorable to defendant.

At 7:15 P.M. on the night of the shooting, defendant left his home in Camden to go to Philadelphia to play cards with some friends. Before leaving, he took his pistol and placed it in the belt of his trousers. Defendant lived with his common law wife at 726 State Street in Camden. At the time that he left for Philadelphia, his wife indicated to him that she was going to retire for the evening. Defendant went to Philadelphia and failed to find a card game, returning earlier than expected. On his return home, defendant discovered that his wife had been to a christening party in the neighborhood. Apparently angered by her actions, he struck her in the face when she returned home and went out and stood on his front porch. Defendant's stepdaughter, an 11-year-old, seeing her mother struck by her stepfather, ran over to the christening party and informed her uncle, defendant's brother-in-law, Carlos, what had transpired. Thereupon Carlos took a knife and headed for defendant's home with several others accompanying him. As Carlos approached the steps, defendant saw that he had a knife. Defendant claims that Carlos stated that he had come to kill him. Carlos began to ascend the steps whereupon defendant shot him in the stomach. There was also testimony by others at the scene that Carlos did not have a knife, or at least did not have a knife drawn, and that nothing was said with respect to him killing defendant.

The basis for the claim that the trial judge should have instructed the jury that defendant had a right to stand his ground at the approach of Carlos, is that the scene of the shooting took place at the entrance of defendant's home. Defendant would have us invoke the ancient concept of man's habitation as his "castle," in determining whether defendant

had a right to stand his ground or retreat under the circumstances. See, generally, *Perkins on Criminal Law* (2 ed. 1969), c. 10 at 1022–1024.

In *State v. Abbott*, 36 *N. J.* 63 (1961), the Supreme Court dealt with the doctrine of retreat as it has been and should be applied in this jurisdiction. While the facts in Abbott did not involve the defense of one's home, they did, however, provide the basis for the court to reaffirm the doctrine of this State with respect to the duty of retreat:

We are not persuaded to depart from the principle of retreat. We think it salutary if reasonably limited. Much of the criticism goes not to its inherent validity but rather to unwarranted applications of the rule. For example, it is correctly observed that one can hardly retreat from a rifle shot at close range. But if the weapon were a knife, a lead of a city block might well be enough. Again, the rule cannot be stated baldly, with indifference to the excitement of the occasion. As Mr. Justice Holmes cryptically put it, "Detached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States*, 256 *U. S.* 335, 343, 41 *S. Ct.* 501, 502, 65 *L. Ed.* 961, 963 (1921). Such considerations, however, do not demand that a man should have the absolute right to stand his ground and kill in any and all situations. Rather they call for a fair and guarded statement of appropriate principles.

\*      \*      \*      \*      \*      \*      \*      \*

1. The issue of retreat arises only if the defendant resorted to a deadly force. It is deadly force which is not justifiable when an opportunity to retreat is at hand. Model Penal Code § 3.04 (2) (b) (iii). As defined in § 3.12 (2) a deadly force means "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm." [at pages 70–71]

■ Under the facts of this case as we have set them forth above, it is quite clear that defendant, who unquestionably resorted to the use of deadly force, could easily have gone back into his own house and closed the door, thus keeping the victim from approaching him with the knife. This observation is made considering all of the testimony, but accepting only defendant's version of the events as they transpired on his doorstep at the time of the shooting.

■ The doctrine of retreat is not to be regarded as an end in itself. It has been established because it serves to

preserve human life. The law cannot condone the taking of the life of another merely because of some ritualistic concept which would seek to protect the integrity of the physical boundaries of a house. A human life, even that of an aggressor, is regarded more valuable than the fetish of the close. We conclude, accordingly, that, under the facts adduced here, the trial judge did not err in failing to instruct the jury that defendant was under no duty to retreat from his assailant.

The judgment of conviction is affirmed.